Vasilka Dimitroff, as Administratrix, etc., of Andrew Dimitroff, Deceased, Claimant, v. The State of New York, Defendant. (Claim No. 25174.)

Court of Claims, July 1, 1939.

*James Rosthal*, for the claimant.

*John J. Bennett, Jr.*, Attorney-General [*Harold Greenstein, Assistant Attorney-General*, of counsel], for the defendant.

Greenberg, J. This claim was presented by Vasilka Dimitroff, the administratrix of Andrew Dimitroff, deceased, to recover damages for the death of Andrew Dimitroff, caused by the negligence of the State.

The deceased, at the time of his death, was an inmate of the Brooklyn State Hospital, having been admitted on September 11, 1937, suffering from syphilis meningo encephalitis, which is synonymous with general paresis, and having symptoms of dementia praecox of the paranoid type. During his confinement at the hospital, transfers to different wards were made, based upon his mental condition and upon the recommendation of the doctor in charge. On December twenty-fourth he attacked a hospital attendant and inflicted a serious injury upon him, as a result of which he was transferred to Ward 24, which was the " disturbed ward " for patients who are " more restless and disturbed than are

other wards " and who, at times, become violent. He was placed in a protective sheet which indicates that he might commit violence upon himself and others, and the attendants were instructed to observe him closely to prevent any homicidal or suicidal attempt on his part. For six days following his transfer to Ward 24 he was observed to be extremely morose, and he gave expression to numerous ideas of unreality and nihilism; his state of mind became more agitated, and on December twenty-ninth he was quite restless all day. That night the deceased went to bed in the dormitory containing forty-eight beds, all occupied by inmates afflicted with various serious types of mania; in the same ward, but in rooms adjoining the dormitory, were ten or twelve other such patients, making a total of fifty-eight to sixty patients of the type already described. All of these fifty-eight to sixty inmates were, from twelve-thirty P. M., in charge of but two attendants, who, in addition to looking after the forty-eight patients in the beds in the dormitory, were at times busily engaged changing restraining sheets on some ten or twelve other patients in the side rooms outside of the dormitory. From five A. M. until six-fifteen A. M., while these attendants were engaged in changing restraining sheets on patients in the side rooms adjoining the dormitory, the forty-eight inmates in the dormitory, including the deceased, had no one looking after or watching them. The attendants were in no position during that period while they were at work in the adjoining rooms to observe what was going on in the dormitory. At about six-fifteen A. M., the deceased was found by one of the hospital attendants hanging with a bed sheet around his neck, from a steel rod affixed to the frame of the door connecting the dormitory with the water section which was adjacent to the deceased's bed, and as a result of which he died by strangulation.

The State was careless and negligent in not providing proper supervision of these forty-eight inmates in the dormitory. The presence of the two attendants in the ward, of which the dormitory was a part, is not such direct and adequate care and attention of the deceased, as he should have had under the circumstances. He was possessed of a tendency for self-destruction; he was " restless " all day; he was even more restless a few hours before his death — " walked up and down in an agitated manner." His general mental condition was known to the attendants in the dormitory and to the hospital authorities. It was negligence on the part of those entrusted with the care of the deceased to have allowed him to remain unattended for upwards of an hour. There should have been direct supervision of the dormitory and the deceased; the inmates in the dormitory should not have been left alone, with no

attendant watching over them even though it was in the early hours of the morning when they were all in bed. Under all of the circumstances, some of which have been but briefly referred to herein, the supervision of the deceased was wholly insufficient and inadequate. (*Martindale* v. *State*, 269 N. Y. 554; *Wilcove* v. *State*, 146 Misc. 87; *Spataro* v. *State*, 166 id. 418.) It was the duty of the State to use reasonable care and diligence, not only in treating, but in safeguarding the deceased, measured by his capacity to provide for his own safety. (*Robertson* v. *Towns Hospital*, 178 App. Div. 285.) The occurrence, resulting in the death of the deceased, was not simply a possibility; it was such as could be reasonably anticipated. As a matter of fact, it might and should have been expected from a patient with suicidal mania. The State is liable for the damages sustained by reason of the death of the deceased under such circumstances.

The assessment of damages sustained herein presents a very interesting and difficult question. Under section 132 of the Decedent Estate Law (Laws of 1920, chap. 919), the damages awarded shall be the amount which the court or jury deems to be a fair compensation for the pecuniary injuries resulting from decedent's death, to the person or persons, for whose benefit the action is brought. (*Wolf* v. *State*, 122 Misc. 381.) "The main elements to be considered are the age of the decedent, *his health*, habits, qualities, expectation in life, *earning ability*, income, the prospect of increase of income, the number, age, sex, situation and condition of those dependent on him for support, and his disposition to support them well or otherwise, and the like. Nothing can be allowed for sentiment, for grief or for suffering, even when death was not immediate, but the precise question is *what were the probable chances of pecuniary benefit from the continuance in life of the decedent worth under all circumstances?* (*Thomas* v. *Utica & Black River R. R. Co.*, 6 Civ. Proc. Rep. 353; 34 Hun, 626; 98 N. Y. 649.) " (*Arnold* v. *State*, 163 App. Div. 253, 264.)

The deceased was an inmate of a State hospital, suffering with a mental ailment of a very serious nature. As has been stated, he was suffering from psychosis with meningo encephalitis with symptoms of dementia praecox, paranoid type. The testimony of Dr. Mark Zeifert, a physician attached to the hospital, was that the decedent's condition was marked and that he was progressively deteriorating; that he had a four plus spinal fluid and a paretic colloidal gold curve and a paretic colloidal mastic curve and that those curves were of the strongest type seen in paresis. When interrogated as to the chances of recovery, the same witness testified that he did not believe the deceased had *any* chance to recover;

that a deteriorating type of syphilis of the brain does not recover because there is organic change of the brain, the brain is destroyed and brain tissue that is destroyed does not recover — "deterioration connotes finality." Dr. Bellinger, the superintendent of the hospital, testified that he was satisfied *beyond the shadow of a doubt,* after reading the history of the deceased and after talking with him, that the deceased was incorrigible and would never recover sufficiently to be allowed outside the hospital. Dr. Beckenstein, of the State hospital staff, who examined the deceased on several occasions prior to his death, testified that with his type of general paretic, the deceased was not going to get better. Dr. Witzel, another staff physician, testified from the hospital records that the deceased was getting progressively worse and that it was his opinion recovery was unlikely. As against this more or less positive medical testimony, based on personal knowledge of the deceased's condition, and the hospital records substantially corroborating the same, Dr. Hoffman, claimant's witness, without having made any examination of the deceased, generally testified to the fact that " with modern forms of treatment and treatment begun early " fifty per cent of the patients having a condition similar to that of the deceased recovered, and twenty-five per cent recovered partially and twenty-five per cent failed to recover at all.

From all of the testimony herein on the question of the deceased's health, it is my opinion that the deceased would not recover. The testimony of the State's medical witnesses was based on personal examinations and personal contact with the decedent and with his hospital record, and is entitled to more weight and more favorable consideration than that of the witness, Dr. Hoffman, who simply made a general statement on the question of likelihood of recovery without any personal knowledge of the deceased's mental condition.

What, under such circumstances, would be the pecuniary loss sustained herein? The deceased, had he lived, could make no contribution of a pecuniary nature to his widow and child. In the case of *Martindale* v. *State* (269 N. Y. 554), often cited in support of the liability against the State for damages sustained by reason of the death of an inmate in a State hospital, Judge ACKERSON of the Court of Claims, in his opinion in Claim No. 23570 stated as follows: " The life of this decedent had little, if any financial value in her condition at the time of her death. There was, however, every reason to believe that this condition was only temporary." The facts in the case at bar are unlike those in the *Martindale* case. From the opinion of the court above referred to, there was every reason to believe that the deceased's condition in the *Martindale*

case was only temporary, whereas in the instant case it is the court's opinion that the deceased's condition was of a permanent nature and that the deceased would not recover or recover sufficiently to leave the hospital.

It is well settled that recovery for damages sustained by reason of one's death must be confined to the pecuniary loss and can only be awarded on proof of loss. In the case of *Mitchell* v. *New York Central & H. R. R. Co.* (2 Hun, 535, 539) the court stated: " The rule was recognized in *McIntyre* v. *New York Cent. R. R. Co.* (37 N. Y. 287) that the burden was upon the plaintiff to prove the pecuniary injury, and such facts as could enable the jury to determine what would be a fair and just compensation for the death of the party; and it is there intimated, if not in fact asserted, that such proof was necessary in order to entitle the plaintiff to recover more than nominal damages. In the case at bar, there was no proof of pecuniary loss to any one except what might be inferred from the two facts, that the deceased was a married woman, and aged twenty years. There was no evidence given of her capabilities, mental or physical; nor of her situation and circumstances in life; nor how she had been or could be of benefit to her husband or next of kin. There was no proof whatever, showing that her life was of any pecuniary value of advantage to anyone."

The damages, if any, are to be calculated on a reasonable expectation of pecuniary benefit from the continuance of the life of the deceased. " Where there is prospective pecuniary loss resulting from death, damages may be recovered in compensation for such loss. It may be difficult, from the nature of the case, to lay down more than a general rule to govern the jury in their award of prospective damages. There should be, at least, *a reasonable expectation* of pecuniary benefit from the life of the deceased to entitle the plaintiff to recover; but the damages are more or less speculative, and reasonable certainty only can be required." (Sedgwick Damages [9th ed.], § 574.) In the case of *Baltimore & Potomac R. R. Co.* v. *Mackey* (157 U. S. 72) the court made the following statement: " Now, manifestly, you cannot estimate in dollars and cents what the damages are in a case of this kind, if there are any at all. That is not possible, but you may and you should take into consideration the age of the man, his health and strength, his capacity to earn money, as you discover it from the evidence, his family — who they are and what they consist of — and then, gentlemen, from all the facts and all the circumstances, make up your mind how much this family, if anything, probably lose by his death, and that would be how much this family would have a reasonable expectation of receiving, how much had they a reason-

able expectation of receiving while he lived, if he had not been killed." While, at best, the measure of damages must be somewhat indefinite, it must be confined and limited to the *reasonable expectation* of the pecuniary loss. Upon the record herein, there can be no reasonable expectation that the claimant suffered any pecuniary loss by reason of the death of her husband.

Taking all of the facts into consideration, there is absolutely no proof that the claimant has sustained any pecuniary loss by reason of the death of Andrew Dimitroff, but, on the contrary, all of the facts are strongly negative of any reasonable probability that the demise of the decedent herein was the cause of any pecuniary injury within the terminology of the statute. It follows, therefore, that excepting for the reasonable funeral expenses, the claimant has failed to sustain the burden of proof and to prove any recoverable damage herein.

MURPHY, J., concurs.