Dorothea E. Donaldson, J.
These claims for damages for personal injuries sustained by the infant claimant, instituted on his behalf by his guardian ad litem, Edgar J. Surprenant, duly appointed by order of this court dated February 6, 1962, and by claimant Edgar J. Surprenant, father of the infant claimant, for medical bills and expenses and loss of companionship, timely filed and not assigned, are predicated upon the alleged negligence of the defendant, the State of New York.
On January 6, 1962, Allen Surprenant, then an infant, was a mentally retarded patient confined to Letchworth Village in Thiells, Rockland County, New York. This institution is a facility operated, maintained and controlled by the defendant, the State of New York. He had been a patient at Letchworth Village for nine and one-half years prior to his discharge in March, 1964. At the time of trial, Allen Surprenant had reached his majority. Since, however, no motion was made to amend the title of this proceeding, the caption remains as originally recorded. The patient sustained lacerations of the volar aspect of the right wrist, cutting flexor tendons and median nerve, when, on January 6,1962, he broke two unscreened and unbarred windows in the shoe room at Gamma Cottage by smashing them with his right hand. Immediate medical attention and hospitalization were furnished by the institution. It is for this injury and its sequelae that claimants sought recovery.
Allen Surprenant, since babyhood, was a discipline problem, often unmanageable, with uncontrollable temper tantrums and an erratic behavior pattern — all aggravated by physical malformation such as cleft palate, hair lip, slight deafness and a spastic condition on the left side causing the dragging of his left foot. Consequently, he was institutionalized at St. Giles until he was five and a half years of age, then remained at home for a period, and thereafter placed in other treatment centers *192 until he was certified as mentally retarded in 1955 and placed at Letchworth Village. While at the village he was permitted to return home on occasions. Particularly from 1959 to 1963 Allen was given certain freedoms, one of which was permission to walk alone on the grounds. He continually asked to return home, wrote many letters requesting the same. When his parents refused, he went into a tantrum. From July, 1961 his behavior was erratic, easily upset, resistive to care, withdrawn, seclusive, irritable, noisy, easily had temper tantrums without reason. He was suspicious, excitable and accused others of persecuting him. His displeasure was evidence by breaking glass, whether such glass was a crystal on a watch, windows or panes in a door. Prior to January 6, 1962, the hospital records indicate that Allen had broken windows probably in December, 1960, but certainly on July 13, 1960, February 13, 1961 and July 14,1961.
Letchworth Village must be recognized as an institution unique in the field of mental health because it is not solely a mental institution that provides excellent custodial care but utilizes many methods in order to rehabilitate its patients.
On January 5, 1962, the infant was transferred from “D ” Cottage to Gamma Cottage. Twice during that night he escaped and returned. On the morning of January 6 he walked from Gamma Cottage approximately one-half mile to the administration building and saw Dr. Isaac Wolfson, the Director of Letchworth Village. The interview was short, during which Allen requested a return transfer from Gamma to “ D ” Cottage. The Director testified in his examination before trial that at the time of the interview Allen was somewhat agitated and that Allen said he did not like Gamma Cottage to which he had been transferred. The doctor stated that he told Allen to return to the cottage and that the matter would be considered on the following Monday. Allen’s testimony before the court revealed that he had recollections of the incident, that his statements were not inconsistent and that he had control over his behavior and his responses. He stated that when he left the office of Dr. Wolfson he was running and crying and he traversed the distance from the office to Cottage “A” where he saw Dr. Bruce, and then, still running and crying, ran to Gamma Cottage. The claimant testified that the reason he went to see Dr. Wolfson was that he was dissatisfied with Gamma Cottage, that he “ raced in ” to see the doctor in rage and said that he wanted to return to Cottage ‘£ D ”. He mentioned that he was angry and felt hurt inside and did not know why he was transferred. When Allen then returned to *193 Gramma Cottage the hospital attendant had been advised by telephone from the administration office to keep the boy in the cottage. When he saw Allen, the infant was crying. The attendant testified that he told Allen to follow the customary procedure which was to remove his shoes, to put on his sneakers and to go into the day room. Following instructions, the patient went into the shoe room to change his shoes, with the attendant waiting for him standing at the door. It was at this point that Alien executed the act previously described.
Claimants contended that the institution authorities failed to exercise reasonable care to prevent injury when they were aware of the infant’s agitated state, and having knowledge of his erratic, emotional behavior pattern, and the intensity of his rages as evidenced by the breaking of glass. Defendant maintained that the attendants at Gramma Cottage, while they had received Allen’s patient records, had not, in the short interval of time, been able to peruse such records and to be personally aware of the patient’s behavior. However, the telephone call from the administration building was sufficient information to place the attendants on notice that their charge was disturbed. The failure to be extremely careful after receipt of such knowledge constitutes negligence.
Very strict supervision is required when a mentally disturbed patient, who has a tendency to break glass or windows, is upset to a high pitch or degree especially when the same has been exhibited by previous behavior.
While a precipitating factor causing the infant’s injury was the propulsion of his hand through the glass window, the initiating cause of the events that flowed therefrom was the unexplained transfer of the boy from “D” to Gramma Cottage, aggravated by, to him, his unsatisfactory interview with the Director of the institution which accelerated a pre-existing state. The infant’s acts do not, therefore, constitute contributory negligence.
Motions made by the defendant to dismiss the claim at the close of claimant’s case, upon which decision was reserved, are denied.
The court noted that claimant’s injury resulted in a large keloid scar on the inner aspect of the right wrist and reduction in grasping power of the right hand resulting in an inability to write legibly. The record reflected that, on occasion, there was pain in the right forearm, and that the impaired handgrasp prevented proper manipulation of eating utensils. For such damage an award is made in the amount of $20,000. That portion of the second cause of action relating to damages *194 claimed as a result of medical bills and medical expenses to the date of trial has been waived. Damages claimed for the loss of companionship of the infant for a period of six months is denied on the basis that Allen was prior to, during and following the hospitalization, a resident and a patient at Letchworth Village. The companionship that claimant had previously been accorded was not removed or destroyed by the instant episode. For that portion of the second cause of action relative to medical bills and expenses that may be incurred in the future, claimant is awarded the sum of $1,000.
Motions made by defendant to dismiss the claim at the close of the entire proof, upon which decision was reserved, are now denied.
Accordingly, claimants are entitled to judgment in the amount of $21,000, divided as follows: to Edgar J. Surprenant, $1,000; to Allen Surprenant, an infant by his guardian ad litem Edgar J. Surprenant, $20,000.